1   **WO**

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7                   FOR THE DISTRICT OF ARIZONA

8

9   Strategic Diversity, Inc., a Massachusetts        No. CV-07-00929-PHX-GMS
    corporation; and Kenneth P. Weiss, an
10  unmarried man,                                    **FINDINGS OF FACT AND**
                                                      **CONCLUSIONS OF LAW**
11                      Plaintiffs,

12  v.

13  Alchemix   Corporation,   an   Arizona
    corporation; and Robert R. Horton and
14  Cheryl Halota Horton, husband and wife,
    Medici   Associates,   LLC,   a   Delaware
15  limited liability company,

16                      Defendants.

17

18          On March 28, 2013, the issue of damages relating to Plaintiff Kenneth P. Weiss's

19  securities fraud claims was tried to the Court without a jury. (Doc. 269.) This Order

20  constitutes the Court's findings of fact and conclusions of law under Federal Rule of

    Civil Procedure 52(a).
21
                                    **BACKGROUND**
22
            This case involves a $500,000 loan by Plaintiff Strategic Diversity, Inc.
23
    ("Strategic") to Defendant Robert R. Horton's company, Defendant Alchemix
24
    Corporation ("Alchemix"). Also at the center of this case is the subsequent and separate
25
    purchase by Weiss, the sole owner of Strategic, of 250,000 shares of Alchemix stock at
26
    the price of $1.00 per share.  In their operative Amended Complaint (the "Complaint")
27
    both Weiss and Strategic bring claims for equitable relief and damages.
28

**FINDINGS OF FACT**

**I.    Strategic's Note with Alchemix**

Horton is the founder and CEO of Alchemix, an alternative fuels start-up company. (Doc. 203, Final Pretrial Order ¶ B(1)(c)–(d).) Sometime after their first meeting, Horton offered Weiss an investment opportunity with Alchemix. (*Id.* at 19:7–9.) On July 2, 2001, Weiss's investment company, Strategic, agreed to loan $500,000 to Alchemix. Strategic and Alchemix consummated the loan through a Convertible Promissory Note (the "Note"), payable after five years at ten-percent interest, or convertible to stock at a price of $2.00 per share. (Doc. 127-2, Ex. 1.) In exchange for consummating the Note, Strategic was given a security interest in Alchemix's patents and Weiss was given a seat on Alchemix's Board of Directors (the "Board") until the Note was repaid. (Doc. 127-4, Ex. 18 at 90; Doc. 129-2, Ex. B at ALCHX00156 ¶ 4.) The agreements provided that the security interest and Weiss's seat on the Board endured "until the Note [h]as been satisfied or converted" into stock. (Doc. 127-2, Ex. 2; Doc. 129, Ex. B at ALCHX00156 ¶ 4.)

In addition, the Note granted Alchemix the right to prepay its debt after one year. The conditions on Alchemix's right to prepay were that Alchemix had to: (1) give Strategic thirty days advanced written notice before prepayment; (2) pay a $10,000 prepayment penalty; and (3) during the notice period, give Strategic the option to convert the Note into 250,000 shares of Alchemix stock at the lower of $2.00 per share or such price as offered to other investors at the time. (Doc. 127-2, Ex. 1 at 2–3.) Alchemix further provided Strategic with a Stock Purchase Warrant, whereby Alchemix was required to obtain Strategic's consent before increasing the number of capitalized shares beyond 40 million because of the dilutive nature of such an increase in shares. (*See* Doc. 129-2, Ex. B at ACLHX00165 ¶ 4c.)

**II.    Western's Investment in Alchemix**

Approximately one year later, in the Spring and Summer of 2002, Horton sought to raise additional capital to develop Alchemix's technology. (*See* Doc. 127-4, Ex. 15,

June 11, 2002 Board Minutes at ALCHX00605–04; Doc. 203, Final Pretrial Order ¶ B(1)(i).)  In cooperation with Horton, a group of investors called the Alchemix Funding Group ("AFG") sought to obtain additional investment capital for Alchemix through additional sales of stock.  Horton, however, began investment discussions with Western Oil Sands ("Western"), a large Canadian energy company.  In June 2002, Horton and Alchemix received an investment proposal from Western.

Horton initially met with Western's Chairman and CEO, Guy Turcotte, on June 12, 2002. (Doc. 224, Jury Trial Tr. at 147:10–148:1.) On June 17, 2002, Western sent a Memorandum of Understanding (the "Memorandum") which described the terms of the investment and a wire transfer of $3 million to Horton. (*Id.* at 148:2–6.) The Memorandum granted Western 1.5 million shares of Alchemix stock at a price of $2.00 per share. (Doc. 127-2, Ex. 9, Memorandum at SDI000080.) The Memorandum further granted Western the "right to purchase" up to an additional $33 million in Alchemix stock in the subsequent months conditioned on Alchemix meeting benchmarks. (*Id.*)  The Memorandum referred to these rights to purchase stock as "options." (*Id.*) Alchemix consummated the Western investment on June 18, 2002. (Doc. 203, Final Pretrial Order ¶ B(1)(n).)

On June 18, 2002, Horton announced the Western investment and sent the Memorandum to Weiss and the rest of the members of the Board. (Doc. 203, Final Pretrial Order ¶ B(1)(m).) On June 24, 2002, Horton contacted Weiss to discuss Western's investment. Horton told Weiss that Western was a multibillion dollar Canadian company with expertise in energy and would be a good strategic partner for Alchemix. (Doc. 224, Jury Trial Tr. at 42:24–43:3.)

Alchemix decided to repay the Note from Strategic, including the early payment penalty. Strategic elected to waive the 30-day notice provision. In the subsequent weeks, Weiss and his executive assistant, Arthur Hagopian, worked with Alchemix's CFO, Richard Armstrong, to execute a series of documents reflecting the repayment of the Note to Strategic, Strategic's relinquishment of its security interest in Alchemix's patents and

Weiss's resignation from the Board. (*See* Pls. Exs. 7–10, 13–14, 17; Doc. 129-3, Ex. G at SDI000069.) On July 2, 2002, Strategic accepted $560,832 from Alchemix as repayment of principal, interest, and prepayment penalties under the Note. (Pls. Ex. 10; Doc. 136-12, Ex. K.) Weiss formally resigned from the Board on July 11, 2002. (Doc. 203, Final Pretrial Order ¶ B(1)(t).) Finally, on August 5, 2002, Strategic released its security interest in Alchemix's patents. (Pls. Ex. 19.)

**III.    Weiss's Stock Purchase From Medici**

In late June or early July 2002, Horton made an offer to sell shares at a favorable price to members of AFG for their ultimately unused efforts to raise investment capital for Alchemix. (Doc. 224, Jury Trial Tr. at 107:25–108:21.) In conjunction with that offer, Horton offered Alchemix stock held by his holding company, Medici Associates, LLC ("Medici"), to Weiss at the same price of $1.00 per share. (*Id.* at 45:16–46:5.) Weiss accepted Horton's offer to invest in Alchemix. On July 8, 2002, Weiss signed a subscription agreement and purchased 250,000 shares of Alchemix stock for $250,000 from Medici. (Pls. Exs. 15, 17; Doc. 127-2, Ex. 11 (Subscription Agreement); Doc. 203 (Final Pretrial Order) ¶¶ 1(r)–(s).) Weiss's stock purchase from Medici was wholly and entirely separate from Strategic's Note to Alchemix.

**IV.    Western's Decision Not to Exercise its Options**

Three to four weeks after their initial meeting on June 12, 2002, Turcotte informed Horton that Western's Board of Directors had decided that Western would not invest further in any ventures outside of their immediate projects. (Doc. 224, Jury Trial Tr. at 176:1–11; Doc. 127-4, Ex. 19 (Gregory Depo.) at 50:9–13.) Turcotte further told Horton that Western would not exercise its options to purchase Alchemix shares, though Western would retain its initial investment of $3 million. (Doc. 224, Jury Trial, Tr. at 184:24–185:2; 244:3–245:9.)

Immediately after Western's decision was communicated to him, Horton convened a meeting with the Board to apprise it of the development. (*Id.* at 185:21–25.) Horton did not inform Weiss because Weiss was no longer on the Board and Alchemix had 500 other

shareholders. (*Id.* at 186:1–4.) Horton did not contact Weiss at any time after that meeting to inform him of Western's decision. (*Id.* at 186:20–25.)

In late 2005, Weiss met with Horton to discuss his investment in and the corporate health of Alchemix since he had not received regular updates as a shareholder of the company. (*Id.* at 57:4–19.) It was at this meeting that Weiss first learned from Horton that Western had not exercised its options. (*Id.* at 58:11–13.)

**V.     The Complaint and Summary Judgment**

On May 7, 2007, Weiss and Strategic brought suit against Alchemix, Robert and Cheryl Horton, and Medici. In their Complaint, Plaintiffs alleged the following counts: 1) federal securities fraud (15 U.S.C. § 78j and Rule 10b-5); 2) state securities fraud in violation of the Arizona Securities Act (the "ASA") (A.R.S. § 44-1991); 3) common law fraud; 4) statutory fraud (A.R.S. § 44-1521, et seq.); 5) negligent misrepresentation; 6) mistake/rescission; 7) failure of condition precedent; 8) equitable restitution; and 9) punitive damages. (Doc. 54.) Plaintiffs requested the Court to provide the equitable relief of (1) reinstating Strategic's Note to Alchemix and its security interest in Alchemix's patents; (2) reinstating Weiss to the Board; and (3) voiding Weiss's purchase of Alchemix stock and restoring all consideration given by Weiss for that stock. (*Id.* at 21.) Plaintiffs further requested compensatory and actual damages, interest, punitive damages, and taxable costs and reasonable attorneys' fees incurred in this action. (*Id.*)

Initially, the Court dismissed the statutory fraud claim (count four) as time-barred. (Doc. 29 at 1; Doc. 148 at 7 n.4.) The Court then granted summary judgment to Defendants on all of Plaintiffs' remaining claims. (Doc. 148 at 19.) To the extent that Plaintiffs' federal and state securities fraud claims were based on Horton's omission regarding Western's investment, the Court held that those claims were barred under the statute of limitations. (*Id.* at 8.)

To the extent Plaintiffs' fraud claims were not time-barred, the Court held that they failed because Plaintiffs had not demonstrated economic loss or other injury. (*Id.* at 13.) At the outset, the Court made clear that although Plaintiffs alleged that the stock

purchase was part of a two-pronged, but single "debt-equity swap," the undisputed facts demonstrated that Alchemix's repayment of the Note to Strategic was separate from Weiss's purchase of the 250,000 shares from Horton. (*Id.* at 5.) Strategic could not have entered into a "debt-equity swap" as Weiss obtained the equity rather than Strategic and Strategic made the Note rather than Weiss. Accordingly, Weiss's purchase of the 250,000 shares must have been separate from Strategic's accepting repayment of the Note

Defendants had a unilateral right to pay off the Note to Strategic one year from origination. That right to prepayment was based on three conditions as described above. Defendants did not fulfill the conditions of notifying Strategic thirty days in advance and providing Strategic the option to convert the Note into shares of Alchemix stock. Plaintiffs, however, did not prove that Strategic suffered injury as a result. They conceded to the lack of injury at oral argument. Further, Weiss, the owner of Strategic, purchased Alchemix shares after the Note was prepaid by Defendants. Plaintiffs also did not prove that Weiss was somehow damaged by the purchase price of Alchemix stock of $1.00 per share. Thus, the Court held that Plaintiffs failed to show injury.

As to the Plaintiffs' equitable claims, the Court first held that there was no claim for rescission based on mutual mistake because there was no mistake of fact. (*Id.* at 17.) Although it is not clear that Arizona recognizes a claim for failure of condition precedent, that claim also failed as a matter of law because the conditions were fulfilled. (*Id.* at 18.) Upon accepting repayment, Strategic was required to release its security interest in Alchemix's patents and Weiss was required to resign from the Board. Finally the equitable restitution/unjust enrichment claim failed because Plaintiffs failed to show any element of "impoverishment" or injury as discussed above. (*Id.*)

## VI.   Appeal

Plaintiffs appealed all of the Court's rulings including the grant of summary judgment to Defendants. (Doc. 152 at 1.) The Ninth Circuit did not address the Court's dismissal of the statutory fraud claim (count four). It affirmed judgment for Defendants as to Plaintiffs' state law claims of common law fraud (count three), negligent

misrepresentation (count five), mutual mistake (count six), failure of a condition precedent (count seven), and unjust enrichment (count eight), but reversed and remanded the federal and state securities fraud claims (counts one and two) for consideration under a "rescissionary measure of damages." *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1211 (9th Cir. 2012).

Those claims were apparently reversed as to both Strategic's and Weiss's claims. The Ninth Circuit did not address this Court's determination that Strategic could show no damage and that the transaction between Strategic, Weiss and the Defendants could not have been a "debt-equity swap" as the transactions were between separate parties.[1] Instead, the Ninth Circuit determined that while Weiss could tender his 250,000 shares to rescind his purchase of Alchemix stock, it would not be possible to return to Strategic the rights it had received from Alchemix pending the complete repayment of its Note which occurred in June 2002. These rights included Strategic's security interests in Alchemix's intellectual property and right to name a director, Weiss, to the Board.  The Ninth Circuit reasoned:

> Although Weiss stands ready to tender the 250,000 shares of Alchemix for the consideration he offered ($250,000) . . . . The Note has long since expired, coming due in July 2006. We doubt that Weiss's demand for his seat on the Alchemix Board is even possible when there does not appear at present to be an existing board. In addition, true rescission would also involve the unfurling of security interests that are currently held as collateral on other debts.

(*Id.* at 1207–08.)

While the panel opinion did not explain why Weiss could not tender the stock to rescind his stock purchase, it apparently held that because tender was impossible for both Weiss and Strategic neither was entitled to rescission, but both might be entitled to the

---

[1] As discussed above, the Note was between Strategic and Alchemix while the Stock Purchase Agreement was between Weiss and Medici.

1    equitable remedy of rescissionary damages upon reconsideration by this Court.[2]

2        Nevertheless, on remand, Strategic acknowledged that it had no claims against the

3    Defendants. Thus, regardless of whether the Ninth Circuit reversed this Court's holding

4    *sub silentio* that, as a matter of law, Alchemix's repayment of the Note to Strategic and

5    Weiss's subsequent purchase of Alchemix stock from Medici could not have been a debt

6    equity swap, Weiss's tender of the stock as a condition of the rescission which he sought

7    was no longer either difficult or impossible. As the Ninth Circuit noted, the only facts

8    that made tender impossible arose from Strategic's request to rescind Alchemix's

9    repayment and reinstate its Note and security interest. (*Id.*) Once that request was

10   dropped, tender of the stock for the amount claimed became possible because, as it noted

11   in its opinion, Weiss could still tender his stock[3] as a condition precedent to rescission.

12       In fact, during a status conference after remand, Plaintiff's counsel agreed that

13   Strategic no longer had a remedy and the remaining issue was whether Horton and/or

14   Alchemix made a misrepresentation or omission that caused Weiss to invest in Alchemix.

15   (March 2, 2012, Hearing Tr. at 5:20–6:17, 7:5–9, 10:16–18.) Plaintiff's counsel also

16   agreed that there was no difficulty with a rescission remedy as to Weiss's investment.

17   (*Id.*) Rescission is the only claim Weiss sought for the stock purchase in his Complaint,

---

19   [2] On appeal, Plaintiffs continued to assert that the repayment of the Note to
20   Strategic and the subsequent stock purchase by Weiss constituted a debt-equity swap that
     inextricably combined the interests of Weiss and Strategic as it related to the Defendants.
21   (Opening Brief of Plaintiffs-Appellants, 2010 WL 6415455, *21) ("As noted above, the
     gravamen of the District Court's errors in this matter was its conclusion that the
22   repayment of the Note and concurrent purchase of Alchemix stock 'must have been
     separate' and unrelated transactions."). The undisputed facts, however, were actually to
23   the contrary.

24       The Ninth Circuit may not have observed that this Court held that the transaction
     could not have involved a debt-equity swap as a matter of law. Thus, the Ninth Circuit
25   may not have perceived any need to offer explanation as to how the transaction could
     have constituted a debt-equity swap and thus why it would not have been possible for
26   Weiss to tender his stock as a necessary condition to rescinding his stock purchase, even
     if tender would have been difficult at best for Strategic in its attempt to rescind
27   Alchemix's repayment of its Note.

28   [3] As this Court is aware or can recall, Weiss has not yet tendered his Alchemix
     stock to the Defendants.

(see Doc. 54 (Compl.) at 21), and hence, the only claim to which he is entitled.  The Ninth Circuit's opinion that the Plaintiffs could seek rescissionary damages as opposed to rescission was explicitly based on its assumption that Weiss could no longer tender the stock he had received from Medici. *Strategic Diversity*, 666 F.3d at 1208.

**VII.   Trial on Remand**

After remand, the issue of fact of whether Horton made a material misrepresentation or omission to Weiss in relation to Weiss's stock purchase from Medici was tried to a jury. (Docs. 209, 211.) At trial, the Court granted judgment as a matter of law against Strategic because, as Plaintiffs conceded, Strategic did not have a claim for damages in this case.  (Doc. 211.) Because the remaining relief requested by Weiss was equitable relief that depended on the resolution of certain issues of fact the jury verdict consisted of answers to several special interrogatories in a special verdict form.

On August 30, 2012, the jury found that (1) Horton made a misrepresentation or omission of fact to Weiss in connection with the sale of 250,000 shares of Alchemix stock to Weiss; (2) the misrepresentation or omission was material to Weiss's decision to purchase the shares; (3) Weiss justifiably relied on the misrepresentation or omission in making the decision to purchase the shares; (4) the misrepresentation or omission caused Weiss to purchase the shares; (5) Weiss should not have discovered the facts underlying the misrepresentation or omission prior to discovering it on May 7, 2005; and (6) Horton learned that Western was not going to exercise its options before Weiss purchased shares on July 8, 2002. (Doc. 218, Jury Verdict.)

On December 3, 2012, the Court denied the Defendants' Motion for Judgment Renewed and Motion for New Trial. (Doc. 248.) At the Plaintiffs' request the Court conducted a bench trial on March 28, 2013, regarding damages. (Doc. 269.)

**VIII.   Value of Alchemix Stock in Years Subsequent to the Omission**

At trial and the subsequent hearing, evidence was introduced from which the Court makes the following findings. The value of Alchemix stock for the period following Horton's omission in July 2002 is opaque. There is no evidence of additional

sales of Alchemix stock until 2006. In September 2003, Horton had taken the position that Alchemix stock was "worthless" because there was no market for the stock at the time. (Doc. 224, Jury Trial Tr. at 267:4–13.) Horton testified that not obtaining the additional investment from Western was "bad news" for Alchemix. (*Id.* at 185:12.) Horton testified, however, that six months after Western's decision, Alchemix formed a joint venture with a large mining and minerals processing company in which the company contributed $2 million, which may have brought value to Alchemix stock. (*Id.* at 264:5–10.)

During the period after late 2005 when Weiss discovered Horton's omission, Horton sold Alchemix stock to a few private investors at the price of $2.00 per share. (Bench Trial Tr. at 164:13–15.) In the fall of 2006, Horton sold shares to a wealthy widow, Mary Menk, a shareholder whom Horton had known for a long time. (*Id.* at 177:17–25.)  Menk approached Horton to purchase shares for herself and as a gift for her employee, Patricia Townsend. (*Id.* at 178:1–9.)  In the fall of 2008, Horton sold shares to another shareholder, Paul Schilling, a senior citizen and "big supporter" of Horton. (*Id.* at 177:12–178:23.) Because of the "collapse of the gas market" in 2008, Schilling knew that Horton "needed some help" and was willing to invest in Alchemix to help it through difficult times. (*Id.*) Schilling purchased 100,000 shares at the price of $2.00 per share. (*Id.* at 165:19–24.)

In addition to these sales to individuals, Alchemix entered into a partnership with Diversified Energy Corporation ("Diversified"), a company that invests in a diversified portfolio of energy technologies. (*Id.* at 178:13–19.) In April 2006, Alchemix executed a stock purchase agreement with Diversified. (*Id.*) The agreement was for a purchase of 2.5 million shares of Alchemix stock at the price of $2.00 per share (*Id.* at 164:21–165:2.) Diversified provided a $600,000 down payment and $4.4 million via promissory note. (*Id.* at 178:20–179:3.) Alchemix purchased also an unspecified number of shares of Diversified stock. (*Id.* at 182:9–11.) Around the same time, the parties entered into a management consulting, marketing, and advocacy arrangement. (*Id.* at 181:17–20.)

Alchemix paid Diversified $1.5 million in exchange for Diversified's assistance in demonstrating Alchemix's technology, obtaining access to government funding, and soliciting the Department of Energy. (*Id.* at 179:4–180:25.) Alchemix paid Diversified $18,500 and $83,330 per month for these services pursuant to two separate agreements. (*Id.* at 182:12–25.) In the fall of 2012, Alchemix and Diversified unwound and rescinded the entire arrangement and both parties divested their stock investment in the respective companies. (*Id.* at 184:2–16.) Diversified retains a limited license to use Alchemix's Hydromax technology in the United States that it received in connection with these dealings, for which Diversified does not pay fees to Alchemix. (*Id.* at 184:21–23.)

## CONCLUSIONS OF LAW

### I.     Federal Securities Fraud Claim

"The elements of a private action under Rule 10b–5 are (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Janus Capital Group, Inc. v. First Derivative Traders,* ____ U.S. ____, ____, n.3, 131 S.Ct. 2296, 2301, n.3, 180 L.Ed.2d 166 (2011) (citing *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 157 (2008)). Rescission is an available remedy for federal securities fraud claims. *See Ah Moo v. A.G. Becker Paribas, Inc.*, 857 F.2d 615, 623 (9th Cir. 1988) (internal citations omitted).

In a 10b-5 action, the Court must consider "whether the plaintiff has shown some causal connection between the fraud and the securities transaction in question." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). The causation requirements comprised of both reliance  and proximate cause or "loss causation." *Id.* To establish transaction causation, the plaintiff must show that but for the material misrepresentation or omission, he would not have engaged in the transaction. *Stoneridge,* 552 U.S. at 171. To establish the necessary elements of loss a party must show both economic loss and loss causation.  To prove loss causation, the plaintiff must demonstrate that the

defendant's deceptive acts proximately caused the plaintiff's loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

When evaluating evidence as to loss causation, the Supreme Court has held that "to touch upon a loss is not to *cause* a loss." *Dura Pharm.*, 544 U.S. at 336 (emphasis in original); *see Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) ("Loss causation requires more."). Yet, a plaintiff is not required to show "that a misrepresentation was the *sole* reason for the investment's decline in value" in order to establish loss causation. *Daou Sys.*, 411 F.3d at 1025 (citation omitted) (emphasis in original). "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement" but will play a role "in determining recoverable damages." *Id.*

Although the jury found transaction causation based on a special interrogatory in the jury verdict form, Plaintiff did not request that the jury answer an interrogatory as to whether Defendants' acts caused Weiss to suffer economic losses. Thus, the Court is left to determine loss causation based on the evidence in the record. On appeal, the Ninth Circuit noted that Weiss's request for relief "does not relieve [him] of demonstrating loss causation." *Strategic Diversity*, 666 F.3d at 1209 (citing 15 U.S.C. § 78bb (limiting recovery to damages "on account of the act complained of")).

One manner in which Weiss may establish loss causation is by proving that the price of his shares declined after the facts underlying Horton's omission or misrepresentation became known, otherwise known as a "fraud on the market" theory. *Metzler,* 540 F.3d at 1062. Weiss purchased 250,000 Alchemix shares at the price of $1.00 per share. To recover damages based on a "fraud on the market" theory, the relevant time period during which Weiss must show loss is soon *after* he and/or other investors learned of the omission. Weiss did not provide sufficient evidence at trial that the share price declined soon after it was revealed to him or other investors that Western

- 12 -

had decided not to exercise its options.[4]

A decline in stock price is not the only method through which Weiss may show loss causation. "With a privately held company, a comparison of market stock price to establish loss causation has less relevance because market forces will less directly affect the sales prices of shares of a privately held company." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053 (9th Cir. 2011) *cert. denied,* 132 S. Ct. 2713, 183 L. Ed. 2d 68 (2012) (internal citations omitted). In these cases, plaintiffs more commonly prove loss causation by showing that a misrepresentation or omission caused them to engage in a transaction and that the revelation of the truth is directly related to their economic loss. *Id.* (citing *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005)).

In *Livid Holdings*, the plaintiff purchased several million dollars' worth of shares in a closely-held company based on an offering memorandum authored by the defendants. The memorandum stated that a large private equity fund-raising had been completed when only a fraction of it had, in fact, been completed. 416 F.3d at 944–45. The company then entered bankruptcy proceedings at which time the plaintiff discovered that the memorandum was false. *Id.* at 950–51. The Ninth Circuit held that the plaintiff had pled loss causation because the defendants' alleged misrepresentation concealed the company's financial situation and "[a]s a result of its dire financial situation, [the company] eventually went bankrupt, which caused [the plaintiff] to lose the entire value of its investment in [the company]." 416 F.3d at 949. The court did not require the plaintiff to allege variation in the stock price to plead loss causation, holding that "[u]nder these circumstances, *Dura* is not controlling." *Id.* at 949 n.2. Rather, to find that

---

[4] Weiss contends that Horton's "anecdotal testimony" of a "handful of isolated sales to private individuals in 2006 and 2008" and "opaque" sales of stock to Diversified Energy in 2007 do not provide reliable evidence upon which to conclude that the price of Alchemix shares remained at or above $2.00 per share after 2005. (Doc. 276 at 3.) But it is Weiss's burden to prove, if at all, that his shares declined in value below $1.00 per share after it became apparent that Western was not going to make further investments in Alchemix. *See Metzler*, 540 F.3d at 1062. It is not sufficient to carry such a burden by attacking the reliability of Defendants' evidence.

loss causation was properly pled, the court relied upon the reduction in value of the plaintiff's investment as a result of the truth concealed by the misrepresentation.

Weiss has not established that Western's decision not to exercise its options was a "substantial cause of [his] investment's decline in value." *Daou Sys.*, 411 F.3d at 1025. The company in *Livid Holdings* had a "negative net worth" of several hundreds of thousands of dollars and the unsuccessful private equity fund raising was the decisive blow to its financial viability. 416 F.3d at 947. The company went bankrupt soon after plaintiff invested in it based on the misrepresentation regarding the company's fundraising. *Id.* at 949. Weiss, conversely, did not present sufficient evidence to show that in July 2002 or soon thereafter, his investment in Alchemix was reduced in value as a result of Western's decision not to exercise its options.

The jury found that Horton omitted to inform Weiss that Western would not exercise its options before Weiss purchased Alchemix stock. Although it is possible that the value of Alchemix stock declined as a result of Western's decision, Weiss did not show that it declined below $1.00 a share at the time he purchased it for that price. Three weeks before Weiss purchased 250,000 shares of Alchemix stock, Western purchased 1.5 million shares for $2.00 per share. Even if Western decided not to exercise its subsequent options, it had just invested $3 million in the enterprise. Therefore, it is also possible that Weiss received an advantageous price per share and that even if the stock declined in value, it was not to a level below $1.00 per share. Thus, Weiss did not show that he was harmed by the omission.

Nor did Weiss show that the value of the stock declined below $1.00 per share soon after he purchased it in July 2002. Weiss points to Horton's testimony that he considered Alchemix stock to be worthless as of September 2003 insofar as there was no market for the stock. Weiss further contends that because Western decided not to exercise its options, Alchemix was not able to build a demonstration plant to prove the commercial viability of its Hydromax technology, which Horton estimated would cost $35 million to build. Western's decision was, according to Horton, "bad news" for

Alchemix as an early-stage technology company. As a result, Weiss argues, Alchemix could not conduct business operations, raise operating revenues, or attract additional investors, ultimately reducing the value of Weiss's investment to a penny per share.

Alchemix did not attract another investment capable of funding its Hydromax technology in order to develop revenue. But Weiss did not show that it was not possible for Alchemix to attract investment and that therefore Western's decision not to invest was damaging to Alchemix's financial viability and as a result, to Weiss's stock value. In fact, Weiss testified that six months after Western's decision, Alchemix formed a joint venture with a large mining and minerals processing company in which the company contributed $2 million. Further, Weiss did not provide evidence that he could not have resold his shares for at least $1.00 per share.

Although the jury found that Weiss relied upon Horton's assurances regarding Western's investment and that Weiss would not have invested otherwise, "establishing 'loss causation' is a more difficult task." *Daou Sys.*, 411 F.3d at 1025. Weiss has not carried his burden prove loss causation and thus may not get rescission for securities fraud pursuant to 10b-5.

## II.    State Securities Fraud Claim

In his Complaint, Weiss alleged that in making material misrepresentations or omissions regarding the Western investment, Defendants violated the ASA. This statute states, in relevant part,

> A. It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, . . . directly or indirectly to do any of the following:
>
> 1. Employ any device, scheme or artifice to defraud.
>
> 2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

A.R.S. § 44-1991(A). Weiss alleged that Defendants violated all three of these subsections.[5] Rescission is an available remedy under the ASA:

> A sale or contract for sale of any securities to any purchaser in violation of . . . [Section 44-1991] is voidable at the election of the purchaser, and the purchaser may bring an action . . . to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on *tender* of the securities purchased . . . .

A.R.S. § 44-2001(B) (emphasis added).

## A.    Joint and Several Liability

Pursuant to the ASA, "an action brought under § 44-2001 . . . may be brought against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase, and such persons shall be jointly and severally liable to the person who is entitled to maintain such action." A.R.S. § 44-2003. The relief requested in this action, however, is rescission, not damages. "The contractual remedy of rescission abrogates the contract and undoes it from the beginning; that is, not merely to release the parties from further obligation to each other in respect to the subject of the contract, but to annul the contract and restore the parties to the relative positions which they would have occupied if no such contract had ever been made." *Hall v. Read Dev., Inc.*, 229 Ariz. 277, 285, 274 P.3d 1211, 1219 (Ct. App. 2012), *review denied* (Aug. 28, 2012), *as amended* (Apr. 26, 2012). (internal quotation marks and citation omitted). As rescission is primarily a remedy between principals, an agent that "was not a party to the contract and received nothing from the other party, . . . is subject only to an action of

---

[5] The Complaint alleges that Defendants "made untrue statements of material fact, or omitted to disclose material facts, which, in light of the circumstances under which they occurred, were materially misleading, and Defendants further employed a device, scheme or artifice to defraud Plaintiffs in connection with said transactions, or otherwise engaged in a course or practice which operated as a fraud and deceit upon Plaintiffs within the meaning of A.R.S. § 44-1991." (Doc. 54 ¶ 41.)

tort," not an action for rescission. Restatement (Second) of Agency § 348 (1958). Weiss purchased the 250,000 shares of Alchemix stock from Medici, Horton's personal holding company and paid $250,000 to that entity. The contract was between Weiss and Medici. Thus, if Weiss succeeds on his claim, Medici is the party liable for restoring the consideration Weiss paid for Alchemix stock.

### B.   Loss Causation

Arizona's loss causation requirement is contained in Section 44–2082(E). That Section "requires any plaintiff who brings an action to 'recover damages' for a violation of Section 44-1991(A)(1) or (A)(3) to prove 'that the act or omission of the defendant alleged to violate the section under which the private action is brought caused the loss.'" *Grand*, 214 Ariz. at 27. Section 44–2082(E), however, "does not apply to a rescission claim." *Id.* at 24. "If tender is possible, proof of proximate cause is not required for traditional rescission relief." *Id.* at 24, 28. *Id.*

Further, Weiss has not proven a claim under subsections (A)(1) or (A)(3) to which the loss causation requirement attaches.[6] He has proven a claim under subsection (A)(2) insofar as the jury found that Horton made a material omission to Weiss regarding Western's investment. That subsection does not require a plaintiff to show loss causation. *Grand*, 214 Ariz. at 25.

Although Weiss does not have to prove loss causation under subsection (A)(2), Defendants retain a "loss causation affirmative defense provided in § 44-1991(B)." *Grand*, 214 Ariz. at 24. The affirmative defense is stated as follows:

---

[6] "The subsections of § 44–1991(A) address different violations, and it is not unreasonable for the legislature to require different proof for each." *Id.* at 26. Liability under subsections (A)(1) or (A)(3) must be premised on more than just an omission of material fact. *See Red River Res., Inc. v. Mariner Sys., Inc.*, CV 11-02589-PHX-FJM, 2012 WL 2507517, *10 (D. Ariz. June 29, 2012) ("To permit liability under § 44–1991(A)(1) or (3) solely on the basis of misstatements and omissions would conflate the three subsections."). "Manipulative conduct must be distinct from omissions and misrepresentations under state law as well in order to give meaning to every provision of § 44-1991(A)." *Id.* (citing *Grand v. Nacchio*, 225 Ariz. 171, 175–76, 236 P.3d 398, 402–03 (2010) ("We ordinarily do not construe statutes so as to render portions of them superfluous.")). Weiss did not prove that Defendants employed a scheme to defraud or engaged in a transaction or course of business which would operate as a fraud.

B. In a private action brought pursuant to subsection A, paragraph 2 of this section or § 44-1992, if the person who offered or sold the security proves that *any portion or all of the amount recoverable* under subsection A, paragraph 2 of this section or § 44-1992 *represents an amount other than the depreciation in value of the subject security* resulting from the part of the prospectus or oral communication, with respect to which the liability of the person is asserted, not being true or omitting to state a material fact required to be stated or necessary to make the statement not misleading, *then the amount shall not be recoverable*.

A.R.S. § 44-1991(B) (emphasis added). In other words, if a defendant proves that a plaintiff's stock did not decline in value as a result of the defendant's omission, then the plaintiff is not entitled to rescission.

Arizona courts have not addressed the issue of whether the affirmative defense applies to claims for rescission based on subsection (A)(2). Unlike the loss causation requirement in Section 44–2082(E) which language limits it to claims for damages, the affirmative defense in Section 44-1991(B) refers to "the amount recoverable" which suggests that it is not so limited. In *Grand*, the court referred to that difference in statutory language between "damages" and "the amount recoverable" to determine that Section 44–2082(E) applied only to claims for damages. *See* 214 Ariz. at 24 ("This difference in language shows the legislature's intent to distinguish between a claim for damages and a claim for rescission."). Here, the "amount recoverable" is the consideration Weiss paid for Alchemix stock. Although it is possible Arizona courts would find an affirmative defense unavailable for a rescission claim "if the defendant's intentional fraud can be understood as inducing a transaction that the plaintiff would not have entered at any price if he had known the truth," *Id.* at 25, the Court assumes without holding that an affirmative defense is available in this case.

### 1.    Waiver of Affirmative Defense

Weiss contends that Defendants have waived their affirmative defense because Defendants did not assert it in their Answers, (see Doc. 63, Alchemix and Horton Ans. at 6–8; Doc. 64, Medici Ans. at 9–10), raise it in the Parties' Joint Pretrial Order, (see Doc.

193 at 6–12), or raise it through the filing of a supplemental Final Pretrial Memorandum pursuant to Fed. R. Civ. P. 26(a)(3)(B). The Federal Rules of Civil Procedure control the timing of the assertion of defenses and when waiver occurs. *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995) (citations omitted). Rule 8(c) requires affirmative defenses to be pleaded in the answer. The Ninth Circuit has held, however, that a defendant's failure to raise an affirmative defense in its answer does not necessarily waive the defense. *Owens v. Kaiser Foundation Health Plan, Inc.,* 244 F.3d 708, 713 (9th Cir. 2001); *see Han*, 73 F.3d at 877–78. The defense may be raised later if the delay in raising it does not prejudice the plaintiff. *Owens*, 244 F.3d at 713 (allowing an affirmative defense for the first time in a motion for judgment on the pleadings); *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) (allowing an affirmative defense for the first time in a motion for summary judgment). That is because "[t]he purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it." *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.,* 402 U.S. 313, 350 (1971)); *see In re Sterten*, 546 F.3d 278, 285 (3d Cir. 2008).

Defendants first raised the Section 44-1991(B) affirmative defense in their trial brief filed on the day of the bench trial. (Doc. 267 at 4.) But Defendants did not waive their defense. There was no unfair surprise to Weiss as a consequence of Defendants' failure to plead specifically this defense. Weiss already had the burden to prove loss causation at trial to establish that he was entitled to damages under his federal securities fraud claim. Similarly, Defendants had to establish a lack of loss causation to prove their affirmative defense against Weiss's state securities fraud claim. *See* § 44-1991(B); *see also Sterten,* 546 F.3d at 285 (holding that defendant did not waive its defense because the analysis involved in proving plaintiff's claim and defendant's defense were substantially similar). Weiss argued that his Alchemix stock never recovered from the impact of Alchemix losing the Western investment and put on evidence to prove that his

stock declined in value. Defendants proffered evidence that the stock was worth more than $1.00 per share for a period of years after Weiss learned of Horton's omission. It was not unexpected to Weiss for Defendants to do so. The Court does not find any prejudice from allowing Defendants to argue their affirmative defense.

### 2.    Value of Alchemix Stock After Horton's Omission

At trial, the jury found that Horton had made a material omission to Weiss regarding Western's investment. Therefore, Defendants have the burden to show that Weiss's Alchemix stock did not depreciate in value below $1.00 per share as a result of the subject of the omission: Western's decision not to exercise its options. *See* A.R.S. § 44-1991(B).

Defendants have not carried their burden. Defendants proffered sales of stock several years after Horton's omission to show that the value of Alchemix stock was greater than $1.00 per share.[7] But these isolated sales took place several years after Horton's omission. Further, the stock sales to individuals were based on Horton's personal relationships and the third sale to Diversified was in the context of other agreements through which Alchemix remitted to Diversified much of the funds Alchemix received. They do not rebut Horton's statement in September 2003 that at the time, the stock did not have value. Although that statement was not sufficient for Weiss to prove loss causation, it is relevant to Defendants' affirmative defense.

---

[7] Horton testified about three sales of stock that he made to private individuals and an entity between 2006 and 2008 at $2.00 per share. In the fall of 2006, Horton sold Alchemix stock to Mary Menk, a wealthy shareholder whom Horton had known for a long time. Menk contacted Horton to purchase shares for herself and her employee, Patricia Townsend. In the fall of 2008, Horton sold Alchemix stock to a senior citizen and supporter of Horton, Paul Schilling. Due to the decline in the gas market in 2008, Schilling wanted to help Horton by investing in Alchemix to get it through tough times. Further, as part of a partnership, Diversified agreed to purchase $5 million worth of shares in Alchemix at $2.00 per share in April 2006. The Diversified purchase was completed in the context of terms and conditions, and other agreements including Alchemix's purchase of Diversified stock, a consulting agreement through which Alchemix paid Diversified $1.5 million in fees, and a licensing arrangement for Alchemix's Hydromax technology without royalty fees.

1    Defendants did not provide a valuation of Alchemix stock as of July 2002 or

2    shortly thereafter to show that Weiss's stock did not decline in value as a result of

3    Horton's omission. Because Defendants did not prove their affirmative defense, Weiss is

4    entitled to rescission of his stock purchase under Section 44–1991(A)(2).

5    **C.    Tender**

6    "[T]ender of the securities purchased" is a required element of Weiss's ASA claim

7    for rescission. *See* A.R.S. § 44-2001(B). As mentioned above, Weiss has not yet tendered

8    his shares of Alchemix stock to Medici. In light of Plaintiffs' renunciation of Strategic's

9    claims after remand, tender is possible even acknowledging the Ninth Circuit's apparent

10   acceptance of the Plaintiffs' characterization of the two transactions as being intertwined.

11   Because Weiss seeks only rescission in his claim, tender is possible, and tender is a

12   requirement to rescission, and because Weiss has not yet tendered his stock, he has not

13   established his claim. In fairness, however, the Ninth Circuit's opinion may have led

14   Weiss to think he was obliged to prove and recover only rescissionary damages, even

15   after Strategic confirmed the dismissal of its claims and tender became possible for

16   Weiss. The Court proceeded on that assumption in granting Weiss's request for a

17   damages hearing.

18   After considering the equities, the Court does not see the fairness in permitting

19   Weiss to both retain the stock and recover damages that would virtually be the value that

20   he paid for the stock. On the other hand, the Court sees no fairness in denying Weiss's

21   claims in light of the confusion over the requirement to tender. In light of the multiple

22   permutations that Weiss made of his own case up to this stage of the litigation, the Court

23   will provide Weiss thirty days to tender his stock. If he does, he will have established his

24   claim for the reasons detailed above, and be entitled to judgment for the restoration of the

25   $250,000 consideration he paid for the stock.  If he does not, the Defendants will prevail

26   on all of Plaintiff's claims.

27   **D.    Prejudgment Interest**

28   The ASA provides for the recovery of "consideration paid for the securities, with

- 21 -

interest" if a "contract for sale of any securities to any purchaser" is found to be in violation of Section 44-1991. A.R.S. § 44–2001(A). "The general rule in Arizona is that a liquidated claim entitles its holder to prejudgment interest." *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 557, 733 P.2d 1131, 1140 (Ct. App. 1986). "[I]f one accepts the evidence and can calculate exactly the amount of damages without relying on the opinion or discretion of a judge or jury, the claim is liquidated." *Scottsdale Ins. Co. v. Cendejas*, 220 Ariz. 281, 288, 205 P.3d 1128, 1135 (Ct. App. 2009) (citing *Canal Ins. Co. v. Pizer*, 183 Ariz. 162, 164, 901 P.2d 1192, 1194 (Ct. App.1995)). Further, a claim is liquidated if "the amount of damages can be computed with exactness." *Interstate Markings, Inc. v. Mingus Constructors, Inc.*, 941 F.2d 1010, 1014 (9th Cir. 1991) (applying Arizona law). A good faith dispute over liability will not defeat a recovery of prejudgment interest on a liquidated claim. *Id.*

Weiss's claim for rescission may be liquidated once he tenders his stock, which is a prerequisite to rescission. A.R.S. § 44-2001(B). As of yet, Weiss has not tendered his stock to Defendants. Because of the lack of tender, no interest is accruing on that amount. Such a result is not inequitable in this case because Weiss did not bring this claim until 2007, two years after he discovered in 2005 that Horton had made an omission in 2002. When he did bring the claim he erroneously characterized the two separate transactions underlying his claims as a "debt-equity swap." That mischaracterization made it seem to the Ninth Circuit as though a rescission remedy was not possible. It was only after remand that Weiss acknowledged Strategic did not have a claim for damages or rescission and clarified that a rescission remedy was practical as to Weiss, making tender a possibility for the first time. Yet, insofar as the Court is aware he has never tendered the stock to Medici. In light of the relief Weiss sought, the lack of any right to rescind the repayment of the Strategic Note, and the lack of tender, it is not appropriate to award prejudgment interest to Weiss, and the Court declines to do so.

### E.     Punitive Damages

Arizona law permits an award of punitive damages "to punish the wrongdoer and

to deter others from emulating his conduct." *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986) (internal citations omitted). The Arizona Supreme Court has held that punitive damages are available in a suit involving rescissionary damages.[8] *Medasys Acquisition Corp. v. SDMS, P.C.*, 203 Ariz. 420, 424, 55 P.3d 763, 767 (2002) ("No reason justifies distinguishing between rescissory damages and compensatory damages as a basis for allowing or denying an award of punitive damages."); *see Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 499, 200 P.3d 977, 996 (Ct. App. 2008). Punitive damages are allowed in such a case "to facilitate judicial administration, to deter misconduct, and to completely serve justice" which "comports with the Arizona policy of providing complete relief to injured parties." *Medasys Acquisition*, 203 Ariz. at 424 (internal citations omitted).

Defendants contend that punitive damages are not an available remedy under the ASA. The statute states that the purchaser of securities "may bring an action . . . to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities . . . ." § 44-2001(A). Nevertheless, § 44-2005 states that "[n]othing in this article shall limit any statutory or common law right of any person in any court for any act involved in the sale of securities." Punitive damages are a common law remedy in Arizona. *See Wyatt v. Wehmueller*, 167 Ariz. 281, 285, 806 P.2d 870, 874 (1991). Further, Arizona courts have held that "if a party has pursued a course of conduct knowing that it created a substantial risk of significant harm to others and its conduct was guided by evil motives, punitive damages should be available to punish such behavior." *Medasys Acquisition*, 203 Ariz. at 424 (internal quotation marks omitted) (collecting Arizona cases). Consequently, punitive damages are an available remedy for

---

[8] Defendants contend that punitive damages are not recoverable in this action as a matter of law. They cite to *Grand*, in which the court states that "a claim for rescission could not encompass compensatory or punitive damages." 214 Ariz. at 9. But the Arizona Supreme Court has held that punitive damages are available where rescissionary damages have been awarded to a plaintiff. *See Medasys Acquisition*, 203 Ariz. at 424.

1    Weiss's ASA claim.

2        Defendants further assert that the Court previously denied Weiss's claim for

3    punitive damages and the Ninth Circuit did not disturb that decision upon appeal. The

4    Ninth Circuit did not address the availability of punitive damages when remanding

5    Weiss's securities fraud claims but because it reversed as to those claims, the Court

6    assumes that it *sub silentio* reversed the denial of punitive damages. *See Strategic*

7    *Diversity*, 666 F.3d at 1211. Thus, punitive damages are still available as a common law

8    remedy in this case.

9        Punitive damages are awarded only "in the most egregious of cases, where a

10   plaintiff proves by clear and convincing evidence that the defendant engaged in

11   reprehensible conduct and acted with an evil mind." *Medasys Acquisition*, 203 Ariz. at

12   424 (internal quotation marks and alterations omitted) (citing *Linthicum v. Nationwide*

13   *Life Ins. Co.,* 150 Ariz. 326, 331–32, 723 P.2d 675, 680–81 (1986)). Clear and

14   convincing evidence means "that which may persuade that the truth of the contention is

15   highly probable." *Thompson v. Better-Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 557, 832

16   P.2d 203, 210 (1992) (internal quotation marks and citations omitted). "While the

17   necessary 'evil mind' may be inferred, it is still this 'evil mind' in addition to outwardly

18   aggravated, outrageous, malicious, or fraudulent conduct which is required for punitive

19   damages." *Linthicum,* 150 Ariz. at 331.

20       The court empaneled the jurors to answer factual predicates necessary to the

21   Court's consideration of equitable relief. At trial, the Parties did not request the jury to

22   determine, by special interrogatory, whether Horton acted with an evil mind in making an

23   omission to Weiss. (*See* Docs. 191 (Pl.'s Proposed Verdict Form), 194 (D.'s Proposed

24   Verdict Form).) At the hearing before the bench trial on damages, Weiss's counsel

25   acknowledged that the issue of punitive damages was for the Court to resolve.

26   (September 21, 2012, Hearing Tr. at 6:25–7:3.) Therefore, the Court will determine

27   whether punitive damages are warranted based on the facts ascertained at trial.

28       There is insufficient evidence that Horton had a malicious intent to secure Weiss's

investment and then deny him a return. Even assuming that Horton knew prior to the time that Weiss purchased the stock that Western had decided not to exercise its options and that he should have disclosed that information to Weiss, there is no evidence that he withheld that information with an evil hand. Western made the $3 million dollar investment on June 18, 2002; only three weeks prior to Weiss's investment. The Memorandum contained the option but not the obligation for Western to purchase up to an additional $33 million of stock over time, and was distributed to Weiss and all members of the Board on the same date of June 18.

Weiss does not challenge Horton's testimony that Horton learned as early as three to four weeks after June 18 that Western would not exercise its options. It is thus possible, sufficient to support the jury's verdict, that Horton could have been aware Western would not exercise its options before Weiss purchased his stock. The Court assumes that the jury concluded either that Horton had represented to Weiss that Western would exercise its options or that he should have informed Weiss about Western's decision not to do so. Even still, Weiss testified that he received a copy of the Memorandum from Horton on June 18 that specified that the additional investment was merely an option held by Western.  Further, Weiss does not question Horton's testimony that he informed members of the Board about Western's decision shortly after it was made and that Weiss was not a member of the Board at this time, but simply one shareholder among five hundred others.

Weiss points to Horton's other conduct with Alchemix investors to show that Horton engaged in egregious conduct warranting punitive damages. For example, Horton did not inform Alchemix investors that some of his earlier ventures had not succeeded financially and had filed for bankruptcy, a fact he did not disclose on his annual reports to the Arizona Corporation Commission. (*See* Doc. 224, Jury Trial Tr. at 147:5–150:16.) Weiss also asserts that Horton misled the Court at trial when Horton contended that the so-called "China deal" was a legitimate current project contributing value to Alchemix stock. Nevertheless, such conduct, even if less than forthcoming, is not relevant to

1  whether Horton had an "evil mind" at the time he made the omission to Weiss.

2  　　　There is not clear and convincing evidence in the record that Horton operated with

3  an "evil mind" when omitting to inform Weiss about Western's decision not to exercise

4  its options. *See Dawson v. Withycombe*, 216 Ariz. 84, 112, 163 P.3d 1034, 1062 (Ct.

5  App. 2007) (finding that although the defendant made fraudulent statements to the

6  plaintiff there was "little if any indication of any 'evil motive' on [the defendant's] part

7  when he made the misrepresentation."). To the extent that Weiss argues that Defendants'

8  fraudulent conduct by itself may justify an award of punitive damages, that argument

9  "extends this concept beyond the basis for punitive damages." *Id.* As the Arizona

10  Supreme Court has stated, "punitive damages are not recoverable in every fraud case,

11  even though fraud is an intentional tort." *Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726

12  P.2d 565, 578 (1986). Punitive damages are not warranted in this case.

13  　　　　　　　　　　　　　　**CONCLUSION**

14  　　　Because Weiss did not show that Horton's omission caused Weiss's loss in

15  relation to his Alchemix stock, he failed to prove his federal securities fraud claim under

16  10b-5. Upon tender of the Alchemix stock to Medici, however, Weiss may prevail on his

17  state securities fraud claim under the ASA because loss causation is an affirmative

18  defense pursuant to Section 44-1991(A)(2) and Defendants did not prove that Weiss did

19  not suffer economic loss as a result of Horton's omission. Plaintiffs will be granted

20  rescission of the stock purchase upon tender. If Weiss does not accomplish tender within

21  thirty days, he will retain his stock and Defendants will prevail on all of his claims.  Even

22  if Weiss prevails, however, he is denied prejudgment interest and punitive damages.

23  　　　**IT IS THEREFORE ORDERED** that Plaintiff Weiss shall have **thirty (30) days**

24  in which to tender his 250,000 shares of Alchemix stock to Medici and apprise this Court

25  that he has done so. If **within fourteen (14) days** after the notice has been filed, Medici

26  has not challenged the existence or adequacy of Weiss's tender, the Court shall enter

27  judgment against Medici.  Should this Court not receive notice of Weiss's tender **within**

28  **thirty (30) days** of the date of this Order, then this suit will be dismissed with prejudice,

with Weiss possessing his Alchemix stock, but no judgment against the Defendants.

Dated this 23rd day of August, 2013.

_____

G. Murray Snow
United States District Judge